### A90A1567. MOON v. THE STATE.
(404 SE2d 273)

Pope, Judge.

Defendant Walter Ted Moon was charged with intimidation of a court officer (OCGA § 16-10-97 (1)), carrying a concealed weapon and loitering or prowling. He was found guilty of intimidation of a court officer and not guilty of the remaining two counts.

The evidence adduced at trial, construed so as to support the verdict, showed the following: On February 11, 1988, defendant appeared before Judge Howard Cook, the Chief Judge of the State Court of Gwinnett County, on criminal trespass charges. At that time defendant was not represented by counsel, and Judge Cook questioned the defendant about his understanding of the nature of a jury trial so as to ascertain defendant's ability to represent himself. During the course of this discussion the defendant became argumentative and belligerent; consequently, Judge Cook held defendant in contempt and ordered the deputy to take him into custody. However, as the deputy approached the defendant, the defendant either struck the deputy or "jerked away," and both defendant and the deputy fell to the floor. Other officers present in the courtroom stepped in to assist the deputy and, following a struggle, the defendant was subdued and removed from the courtroom. Defendant was incarcerated for 20 days for contempt, and Judge Cook transferred all matters concerning the defendant, including the criminal trespass charges, to Judge Bishop From that time forward, except for signing an order scheduling a hearing, Judge Cook did not preside over any matters involving the defendant.

Defendant subsequently was sentenced to 24 months probation however, in May of 1989 defendant's probation was revoked and he was incarcerated. Defendant visited the office of his probation super visor in September 1989 after being released from jail. According to testimony presented at trial, defendant became very agitated and hostile during this meeting because his home had been broken into while he was incarcerated. Defendant apparently blamed Judge Cook Judge Bishop, his probation officer and others for his problems, and made the statement that he could not rest until he "got even." When defendant was asked if he was making a threat, he responded, "You know what I mean." Defendant also met with Linda Wood, his proba tion officer's supervisor, and, according to her testimony, made state ments that he was unhappy with the system, which he described a corrupt. Defendant also referred to Judges Cook and Bishop a

"weasels" and stated that he would "get even" with them. Wood testified that at one point during the meeting defendant became hostile and violent and had to be handcuffed because of his aggressive behavior. Wood testified, however, that defendant eventually became calmer and agreed he would submit to probation supervision and whatever instructions he was given.

Robert Greenwald, an assistant Gwinnett County solicitor, testified that defendant also visited his office in September of 1989 and stated "I'm going to get those weasels, I'm going to get them, I'm going to get even with [Judges Cook and Bishop]." Defendant further explained that he was going to get even with Judge Cook because he had sentenced him to 20 days for contempt and with Judge Bishop because he was Judge Cook's "stooge" and had revoked his probation. When asked how he was going to get even, defendant responded "Well, I'm not going to tell you how I'm going to do it, but I have my ways of getting even." Defendant also stated that "this is all I think about" and according to Greenwald, was irate, red in the face and hostile.

Both Judge Cook and Judge Bishop were notified of defendant's statements concerning them. As a result of defendant's statements Judge Cook obtained photographs of the defendant and a description of the vehicles he drove and gave this information to his staff and family. On the night of October 2, 1989, Judge Cook's wife and daughter were returning home from a church service when Mrs. Cook noticed a light blue pick-up truck matching the description of defendant's vehicle parked inside the entrance to their subdivision. The truck began following her as she drove past her house to a neighbor's house. Defendant then turned around in her driveway and proceeded back towards the entrance to the subdivision. Mrs. Cook telephoned her husband, who was at her parents' house, and told him what had happened. Judge Cook drove home and as he turned into the subdivision, defendant pulled in behind him and followed him to his driveway; however, when Judge Cook proceeded past his driveway defendant again turned around and went back to the entrance to the subdivision. Judge Cook drove to his neighbor's house and notified the police. When the police arrived, they requested that Judge Cook come to the subdivision entrance to identify the defendant and because the defendant stated he wanted to talk to Judge Cook. According to Judge Cook, defendant told him he had been unable to eat, sleep, drink, think or work because he was totally consumed by what the Judge did to him, that the Judge had "wronged" him and that he was going to bring it to an end so he could lead a normal life. Defendant stated he was going to do whatever it took to bring it to an end, and the Judge also was going to have to pay him damages. Judge Cook asked defendant if he was going to harm him physically, and

defendant responded that he was "not dumb enough to say something like that." In order to placate the defendant, the Judge told defendant to call him if he wanted to talk and then left the scene and went home.

Douglas Maddox, a patrolman with the Gwinnett County Police Department, testified defendant initially stated that he was parked at the entrance to the subdivision because he was waiting for his girl friend; defendant, however, could not provide the officer with his girl friend's address. The defendant subsequently told the officer he was there because he wanted to talk to Judge Cook about his case and that he was trying to get Judge Cook's tag number so he could ascertain when Judge Cook was at church, because he felt that would be a good place to confront the Judge. The officer further testified he arrested defendant after discovering a loaded .44 magnum pistol concealed under some clothes on the front seat of defendant's truck.

At trial defendant denied he threatened Judge Cook, and stated he had no intention of physically harming Judge Cook or his family. Defendant also testified he had contacted both the ACLU and the Judicial Qualifications Commission about his grievances against Judge Cook.

1. In related enumerations of error, defendant argues the trial court erred in overruling his pre-trial motion to dismiss because the charges as stated in count one of the indictment (intimidation of a court officer) did not fall within the purview of OCGA § 16-10-97 (1), and in denying his motion for directed verdict on the basis that the evidence was insufficient to support his conviction under that section.

Subsection 1 of OCGA § 16-10-97 makes it a crime punishable by a fine of not more than $5,000 or imprisonment for not more than five years, or both, to "(1) [Endeavor] to intimidate or impede [by threat or force or by any threatening letter or communication] any grand juror or petit juror or any officer in or of any court of this state or any court of any county or municipality of this state or any officer who may be serving at any proceeding in any such court *while in the discharge of such juror's or officer's duties. . . .*"

Defendant argues that his conviction under OCGA § 16-10-97 (1) cannot stand because Judge Cook had recused himself in early 1988 and thus was not in the discharge of any official duty concerning the defendant at the time the offense allegedly occurred in October 1989. However, we do not think the phrase "while in the discharge of such . . . officer's duties" should be read so as to restrict the application of that section only to those threats or other attempts to intimidate or impede which occur while the case is actually pending before the court officer. Rather, we think the legislature intended by this language simply to limit the application of OCGA § 16-10-97 (1) to those situations which arise out of or are related to the performance of the

court officer's official duties, whether the proscribed activities occur while the court officer is actively engaged on the matter giving rise to the offense or whether the proscribed activities occur at some other juncture. Here the threats and other actions of the defendant were the direct result of his dissatisfaction with the manner in which Judge Cook handled his case and thus clearly arose out of and were related to the "discharge of [Judge Cook's] duties [as an officer of the court]." Consequently, we find no merit to defendant's first two enumerations of error.

2. Defendant next argues he was entitled to a mistrial on the basis that Judge Bishop's testimony constituted improper evidence of similar transactions because the State had failed to give him the required notice of its intent to introduce evidence of similar acts. The record shows, however, that defendant did not urge this basis below, but instead objected on the basis that the testimony in question was irrelevant and prejudicial. "It is well settled that a reason urged by enumeration of error on appeal which is different from that urged below will not be considered for the first time on appeal." (Citations and punctuation omitted.) *Iglesias v. State*, 191 Ga. App. 403, 404 (381 SE2d 604) (1989). Moreover, the evidence at issue was cumulative of other evidence presented at trial, and for this reason also its admission does not constitute reversible error.

*Judgment affirmed. Andrews, J., concurs. Beasley, J., concurs in judgment only.*

DECIDED JANUARY 31, 1991 —
REHEARING DENIED MARCH 15, 1991 —

*L. David Wolfe & Associates, L. David Wolfe,* for appellant.
*Thomas C. Lawler III, District Attorney, Stephen E. Franzen, Debra K. Turner, Assistant District Attorneys,* for appellee.